IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DAVID SCHULTE,

                       Plaintiff,                                       CV-07-6269-ST

        v.                                               OPINION AND ORDER

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                       Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, David Schulte ("Schulte"), seeks judicial review of the Social Security

Commissioner's final decision denying his application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act ("Act"), 42 USC §§ 401-33.  This court has jurisdiction

under 42 USC § 405(g).  All parties have consented to allow a Magistrate Judge to enter final

orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636©).  For the

reasons that follow, the Commissioner's decision is affirmed.

1 - OPINION AND ORDER

## ADMINISTRATIVE HISTORY

Schulte protectively filed an application for DIB on January 14, 2005, alleging disability since April 2, 2001. Tr. 64-66, 130-32. His application was denied initially and on reconsideration. Tr. 33-35, 40-44. Schulte then requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 31. An ALJ conducted a hearing on February 15, 2007. Tr. 195-223.

ALJ John Madden issued a decision on February 23, 2007, finding that Schulte could not perform his past relevant work, but could perform other work and, therefore, was not disabled at step five of the sequential evaluation process. Tr. 14-22. The Appeals Council denied Schulte's request for review on July 26, 2007, making the ALJ's decision the final decision of the Commissioner, subject to review in a federal district court. Tr. 4-8; 20 CFR §§ 404.981, 422.210.

## FACTUAL BACKGROUND

### I. Age, Education, and Past Relevant Work

Born in 1961, Schulte was 39 years old at the alleged onset of his disability and 45 years old at the time of the hearing before the ALJ. Tr. 64, 200. He completed high school and a computer programming course. Tr. 140, 201. His past relevant work was as an industrial maintenance repair helper, a swimming pool servicer, hot press operator, and machine packager. Tr. 109-13, 135-36, 216-17. In his application for DIB, Schulte alleged disability due to episodic arthritis which causes severe pain, swelling, redness, and tenderness in various joints (ankles, knees, hips, back, shoulders, etc.) and renders him periodically incapacitated for hours or days at a time. Tr. 134.

### II. Medical Evidence

The available medical records indicate that Schulte treated with family practitioners, David Grube, M.D., and Bruce Byram, M.D., beginning in mid-March 2001.  Tr. 174-88. Initially, Schulte's treatment focused on his high blood pressure and Schulte reported that he was currently experiencing no arthritis symptoms.  Tr. 184-85.  However, at a visit on February 27, 2003, Schulte reported a "10-year history of intermittent joint pains," describing the flares as "typically severe and accompanied by signs of inflammation such as redness and swelling." Tr. 181.  At that time, Schulte reported to Dr. Grube that he took Aleve for his pain which was "moderately helpful."  Tr. 180.  Dr. Byram referred Schulte for treatment with John R. Ladd, M.D., a rheumatologist.

Dr. Ladd apparently first saw Schulte on March 10, 2003.[1]  At that time, Schulte reported a 10 year history of joint problems, escalating in frequency from about once a year (in the past) to once a month over the past year (2002 and early 2003).  Tr. 178.  Schulte was taking Aleve, had no synovitis in his hands, 100% grip and fists, and "normal" wrists, elbows, shoulders, midfoot, hindfoot, and range of motion in his ankles, knees, and hips.  *Id*.  Although Schulte had "some synovial thickening of the second right [metacarpal-phalangeal] joint" and varicose veins (varicosities) in his ankles, he otherwise had "no other joint abnormalities."  Tr. 179.  Dr. Ladd diagnosed inflammatory arthritis (with need to rule out gout), macrocytosis, and increased glucose.  Tr. 179.

A year and a half later, on October 21, 2004, Dr. Ladd again saw Schulte.  Tr. 176-77.  At that time, Schulte reported attacks of joint pain and swelling "about once a week over the past 4

---

[1] Although the medical chart from that date appears to be prepared by "Medical Student" Sarah Haastrup (Tr. 179), the date is consistent with Dr. Ladd's later note on October 21, 2004, that he saw Schulte "about a year and a half ago."  Tr. 176.  On February 27, 2003, Schulte was seen by Dr. Grube in conjunction with Haastrup.  Tr. 181.  Thus, this court assumes that Haastrup also attended the appointment Schulte had two weeks later with Dr. Ladd on March 10, 2003.

to 6 months," usually involving swollen knees which were sufficiently uncomfortable to prevent

him from leaving his home.  Tr. 176.  The most recent attack involved the left wrist, which was

still swollen and which Dr. Ladd attempted to aspirate, but to no avail.  *Id*.  Dr. Ladd discussed

various drugs (Methotrexate, Sulfasalazine, and Hydroxychloroquine) with Schulte, noting that

"if he is having as much trouble as [he and his wife] say he is, he should be on a slow-acting

agent to see if we can stop the attacks."  *Id.* Dr. Ladd diagnosed "either palindromic rheumatism

or gout" with "palindromic arthritis[2] as the more likely diagnosis."  Tr. 177.  He asked Schulte to

come see him when he had his next attack to "see if we can aspirate a joint to make a definitive

diagnosis," and gave him Indomethacin SR 75 mg to "take twice daily and see if that will prevent

his attacks."  *Id*.        The next chart note reflects an office visit to see Dr. Ladd seven months

later on May 18, 2005.  Tr. 174-75.  He had been having "intermittent attacks in the right hand for

about 2 weeks" and his hand was "completely swollen and puffy and somewhat red."  Tr. 174.

He had limited range of motion in his hand, along with redness over the index and middle

proximal interphalangeal joints and swelling in those joints.  *Id*.  Dr. Ladd again suggested that

Schulte consider slow-acting drugs, but Schulte felt "he [could] not afford to go on other

medications."  *Id*.  Dr. Ladd gave Schulte samples of Mobic (meloxicam), a nonsteroidal anti-

inflammatory drug, to take twice daily.  *Id*.  That is the last entry in the record of any visit to

Dr. Ladd prior to the expiration of Schulte's insured status on December 31, 2006.  Tr. 23.

---

[2]  "Palindromic arthritis — better known as palindromic rheumatism — (PR) is a condition where there are recurrent episodes of pain swelling warmth and stiffness of joints.  The problem usually involves 2 or 3 joints, with an onset over hours. PR is characterized by episodic articular or periarticular pain, often with redness. The pain may be intense but rarely lasts longer than 2 or 3 days and resolves totally afterwards with no sequelae.  However episodes of recurrence form a pattern, with symptom free periods between attacks lasting for weeks to months.  In 30-40 percent, however, they become more frequent and may develop into rheumatoid arthritis. Similarly, rheumatoid factor can become positive over years."
http://www.arthritis-treatment-and-relief.com/palindromic-arthritis.html (last accessed July 17, 2008)

Schulte again saw Dr. Ladd on February 12, 2007, three days before the hearing before the ALJ.  Tr. 193.  At that time, he reported to Dr. Ladd that his arthritic symptoms typically involved one joint at a time, came on abruptly, caused joint pain and swelling, usually took place once or twice a week on average, and that he rarely goes for a week without any attacks.  *Id.*  He was experiencing swelling in his right third metacarpal-phalangeal joint, but the remainder of small joints in his hands, wrists, elbows, and shoulders were normal.  *Id.*  Schulte reported to Dr. Ladd that "he [could] not afford medical treatment" and had applied for disability.  *Id.*

Following that appointment, Dr. Ladd sent a letter to Schulte's attorney stating that he diagnosed Schulte with palindromic arthritis based on Schulte's history of "fairly typical acute attacks with swelling and substantial pain lasting 3 days or so," and noted that he had seen Schulte "on 2 occasions when he has had swollen joints, which are consistent with this diagnosis."  Tr. 189.  Dr. Ladd also noted that palindromic arthritis is "migratory involving various joints" and usually causes joint pain which is "quite intense and swelling occurring in a single joint and lasting for about 3 days."  *Id.*  Based on Schulte's report of attacks occurring once or twice a week, Dr. Ladd concluded that "given the present pattern of his illness, [Schulte] is not capable of sustaining a regular work schedule" and that "his attacks are severe enough to cause him to miss work and he would have difficulty doing even sedentary work."  *Id.*

///

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of no less than 12 months[.]"
42 USC § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her
disability.  *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996)
(citations omitted).  The ALJ engages in a five-step sequential inquiry to determine whether a
claimant is disabled within the meaning of the Act.  20 CFR § 404.1520.  Below is a summary of
the five steps, which also are described in *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999):

At step one, the Commissioner determines whether the claimant is engaged in substantial
gainful activity.  20 CFR § 404.1520(b).  If so, then the claimant is not disabled.

At step two, the Commissioner determines whether the claimant has "a severe medically
determinable physical or mental impairment."  20 CFR § 404.1520©).  If not, then the claimant is
not disabled.

At step three, the Commissioner determines whether the severe impairment "meets or
equals" one of the impairments listed in 20 CFR Part 404, Subp. P, App. 1.  20 CFR
§ 404.1520(d).  If so, then the claimant is disabled.

If the analysis proceeds beyond step three, the Commissioner must determine the
claimant's residual functional capacity ("RFC").  The RFC is an assessment of work-related
activities the claimant can perform on a regular and continuing basis, despite the limitations
imposed by his impairments.  20 CFR § 404.1545(a); Social Security Ruling ("SSR") 96-8p, 1996
WL 374184 (July 2, 1996).

Using the RFC, the Commissioner determines at step four whether the claimant can
perform past relevant work.  20 CFR § 404.1520(e).  If so, then the claimant is not disabled.

Finally, at step five, the Commissioner determines whether the claimant is able to perform other work in the national economy. 20 CFR § 404.1520(f). If not, then the claimant is disabled.

At steps one through four, the burden of proof is on the claimant. *Tackett*, 180 F3d at 1098. However, at step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. *Id.*

## ALJ'S FINDINGS

At step one, the ALJ found that Schulte had not engaged in substantial gainful activity since April 2, 2001, the alleged onset date. Tr. 16. At step two, the ALJ found that Schulte suffers from two severe impairments, namely palindromic arthritis and obesity, but that those impairments did not either singly or in combination meet or medically equal a listed impairment. Tr. 17. Next, the ALJ determined that Schulte retains the RFC to sit, stand, or walk for six hours in an eight hour day, lift 10 pounds frequently, and 20 pounds occasionally, and could perform light work. Tr. 17, 21. Based on the testimony of a vocational expert, the ALJ then concluded that Schulte could not perform his past relevant work, but could perform other work, including jobs as a ticket seller (DOT 211.467-030), information clerk (DOT 237.367-022), and cafeteria attendant (DOT 311.677-010). Tr. 22. Accordingly, the ALJ concluded that Schulte was not disabled at any point through the date of the ALJ's decision on February 23, 2007.

///

///

///

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Bayliss v. Barnhart*, 427 F3d 1211, 1214 n1 (9th Cir 2005) (internal quotation marks and citation omitted). "It is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Orn v. Astrue*, 495 F3d 625, 630 (9th Cir 2007), quoting *Burch v. Barnhart*, 400 F3d 676, 679 (9th Cir 2005). This court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Id,* citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading of the record. *Batson*, 359 F3d at 1193.

## DISCUSSION

Schulte challenges the Commissioner's decision on three grounds, each of which builds on the other. He contends that the ALJ failed to: (1) give adequate reasons for discrediting his testimony; (2) give adequate reasons for discrediting the opinion of his treating physician, Dr. Ladd; and (3) prove that he retains the ability to perform other work in the national economy.

///

///

## I. Schulte's Credibility

8 - OPINION AND ORDER

### A.    Legal Standard

Once a claimant shows an underlying impairment which may "'reasonably be expected to produce the pain or other symptoms alleged,'" the ALJ must provide "clear and convincing" reasons for finding a claimant not credible. *Lingenfelter*, 504 F3d at 1036, quoting *Bunnell v. Sullivan*, 947 F2d 341, 344 (9th Cir 1991) (*en banc*) and *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996). The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell*, 947 F2d at 344. The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F3d at 1284. The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id.*

### B.    Analysis

The ALJ found that Schulte has the severe impairments of palindromic arthritis and obesity and that his treating and examining doctors observed symptoms consistent with those impairments. Despite finding an objective basis for these impairments, the ALJ found that the record did not substantiate Schulte's allegations that he experienced arthritic episodes as often as once or twice a week. Tr. 19-20.

The ALJ gave several reasons for rejecting Schulte's testimony. First, he noted the contradiction between Schulte's hearing testimony that "his symptoms now are about the same as when he last worked" and the fact that he ceased work, not because of his symptoms, but because

he "and several other employees were terminated because of a lack of work." Tr. 20. The ALJ

further noted that Schulte "testified that he missed significant amounts of work due to his

symptoms, but his actual attendance report for the 12 months of 2000 show only one episode,

lasting three days, in which arthritis was an issue." *Id*. As additional reasons, the ALJ found that

Schulte was "not consistent in his own description of the frequency of flares," that "[a]ctual

documentation of his symptoms is all but non-existent in the nearly six years since [he] alleged he

became disabled," and that his "attempts at treatment in themselves are not consistent with a

disabling impairment." *Id*.

Evidence that a claimant left a job for reasons unrelated to an impairment, waited a

significant amount of time prior to seeking medical treatment, and failed to seek treatment despite

complaints of severe pain are sufficient reasons for rejecting subjective pain testimony. *Bruton v.

Massanari*, 268 F3d 824, 828 (9th Cir 2001). If the record supports the ALJ's findings that

Schulte was laid off for reasons unrelated to his disability, waited a significant amount of time

before seeking medical treatment and failed to seek treatment despite severe pain, then the ALJ

did not err by rejecting Schulte's subjective testimony.

As reported by his employer, Schulte was laid off on April 27, 2001, due to a lack of

work. Tr. 146. His employer also confirmed a problem with absences by reporting that Schulte

"was marked unsatisfactory on his performance review - he did not meet attendance

requirements." Tr. 145. Schulte explained, however, that his "attacks were happening so often

and [he] missed so much time [that he] was at the top of list to be laid off." Tr. 135. According

to Schulte, he missed "a lot of work" due to "the arthritis in [his] wrists and [his] ankles and [his]

knees." Tr. 208.

Based on the employer's work attendance records, the ALJ had reason to question Schulte's explanation for his absences  Those records show that Schulte missed significant amounts of work from January 1, 2000, through January 31, 2001.  Tr. 147.  However, they fail to show that the absences were caused by arthritis.  Schulte was sent home "sick" on January 2, 2000 (but without any further information as to the illness) and off work for three days between October 20-22, 2000 due to "arthritis in [his] ankle."  *Id*.  Other than those two incidents, Schulte was off work for seven additional days in 2000 due to a lack of work and for six additional days due to flu symptoms.  *Id*.

The ALJ failed to recognize, however, that the work attendance records are incomplete and do not cover the final three months from January 31 through April 27, 2001.  Part of that period is covered by one contemporaneous medical record which tends to refute any implication that Schulte missed a significant number of days at work during March 2001.  On April 5, 2001, Schulte reported to Dr. Grube that since his last visit, he "only missed 1 day of work when he had a really sore foot" and that his arthritis was "quiescent."  Tr. 185.  The record does not indicate when Dr. Grube saw Schulte prior to April 5, 2001, but it appears that a blood draw was ordered on March 14, 2001.  Tr. 186.  Assuming that is the date of Schulte's previous appointment with Dr. Grube, then Schulte reported no arthritis attacks between March 14 and April 5, 2001.  That still leaves a gap from January 31 through March 14 and from April 4 through 27, 2001, during which Schulte could very well have missed work due to his arthritis attacks.  Without complete attendance records, the ALJ did not have an adequate basis to conclude that Schulte was less than candid about his symptoms leading to his lay off.  Nevertheless, the ALJ did have an adequate basis to question the credibility of Schulte's testimony that he missed significant amounts of work

due to his symptoms for at least for 14.5 of his last 16 months of employment (January 1, 2000,

through January 31, 2001, and March 14 through April 5, 2001).

Next, the ALJ found Schulte's descriptions of the frequency of his flares internally

inconsistent, explaining:

> He testified that episodes occur once a week, but told Dr. Ladd that they
> occur twice a week. He testified that his disease is about the same as it is
> now, when he last worked, but told Dr. Ladd in 2003 that flares had
> occurred only once a year until the last year, where they occurred once a
> month.

Tr. 20.

According to the medical record, Schulte has reported to Dr. Ladd an increasing frequency

of attacks.  On March 10, 2003, he reported to Dr. Ladd a frequency of attacks that escalated from

once a year over the past 10 years to once a month beginning in March 2002.  Tr. 178.  Eighteen

months later on October 21, 2004, he reported attacks that had increased to once a week over the

past four months.  Tr. 176.  On February 12, 2007, he reported attacks once or twice a week on

average.  Tr.  193.  Yet, at the hearing only three days later, he testified inconsistently that his

attacks occur "[e]very other week, every week randomly."  Tr. 211.  Also, as correctly noted by

the ALJ, he testified that the "condition that was causing [him] to miss work" is "about the same"

since he left work.  Tr. 208.  Schulte now contends that he was referring to the severity of his

condition, not the frequency of his attacks, but that is not clear from his testimony.  Although

some might agree with Schulte's interpretation, this court cannot say that the ALJ's interpretation

of the testimony was unreasonable.  *See Sample v. Schweiker*, 694 F2d 639, 642 (9th Cir 1982) (in

reaching findings the ALJ "is entitled to draw inferences logically flowing from the evidence").

Next, the ALJ noted that the absence of documentation of symptoms over a six year period and that Schulte's attempts at treatment were inconsistent with his allegations.  Tr. 20. The medical records reflect that over the nearly six-year period prior to expiration of his insured status, from March 2001 through December 31, 2006, Schulte's treating doctors observed arthritic symptoms on only four occasions, and then only in his right hand and left wrist.  Tr. 181 (February 27, 2003, a "little synovial thickening" in the second metacarpal-phalangeal joint that was "certainly not dramatic and [showed] no swelling"), 179 (March 10, 2003, no joint abnormalities other than "some synovial thickening of the second right [metacarpal-phalangeal] joint"), 176 (October 21, 2004, swelling in left wrist, reporting problem in left hand a few days earlier), and 174 (May 18, 2005, swelling and pain in right hand, report of problems in left hand two weeks previously, and left knee three weeks previously).  On March 15, 2005, examining physician K. Clair Anderson, M.D., similarly found a "history . . . consistent with recurrent acute arthritis" but "essentially . . . no physical findings" other than "mild swelling on the dorsum of the right hand [and] lack of hair growth on the dorsum of both hands [indicating] that [Schulte] probably has had episodes of acute inflammation of both hands."  Tr. 150.

The medical record is devoid of evidence of treatment for arthritis symptoms until nearly two years after Schulte's alleged onset date of April 2, 2001 (Tr. 181-82, record related to probable arthritis February 27, 2003).  It also reveals a lack of any follow-up treatment by Dr. Ladd for a year an a half after that (Tr. 176-79, gap in treatment between March 10, 2003 and October 21, 2004), followed by only one visit nearly seven months later (Tr. 174-75, chart notes from Dr. Ladd dated April 18, 2005) prior to the expiration of Schulte's insured status on December 31, 2006.

At his first appointment on March 11, 2003, Dr. Ladd asked Schulte to return the next time his arthritis flared.  Tr. 177.  At his next appointment with Dr. Ladd, a year and a half later on October 21, 2004, Schulte reported joint pain and swelling about once a week over the preceding four to six months.  Tr. 176.  Dr. Ladd thought if Schulte was "having as much trouble as they say he is, he should be on a slow-acting agent to see if we can stop the attacks."  Tr. 176. Dr. Ladd went over several medication options, explaining the side effects and giving him brochures on each of them.  *Id*.  However, Schulte's next visit with Dr. Ladd took place a week after the reconsideration denial of his disability claim and was prompted "to document his disability."  Tr. 33 (reconsideration denial May 10, 2005), 174 (May 18, 2005 appointment with Dr. Ladd).  His next appointment with Dr. Ladd was in anticipation of his hearing before the ALJ. Tr. 193 (appointment on February 12, 2007, three days prior to hearing before ALJ).  On both of those visits, Schulte declined the drugs due to cost concerns, despite Dr. Ladd's apparent conclusion that there was "a very good chance that we might be able to find a treatment for him that would be helpful in allowing him to be active."  Tr. 193.  Because Schulte could not afford the cost of treatment, he was in a "Catch-22 situation."  *Id.*

With regard to Schulte's claim that his lack of care was related to insurance issues, the ALJ found Schulte's failure to make an effort to determine the amount of necessary co-payments under his wife's insurance policy and failure to attempt to obtain the medicines recommended by Dr. Ladd (Tr. 203) inconsistent with his testimony that he had medical issues that affected his functioning.  Tr. 20.  Finally, the ALJ discredited Schulte's statements about the frequency of his arthritic flares based on his unexplained failure to follow his doctors' advice, and in particular his failure to pursue obtaining the medications suggested by Dr. Ladd.  *Id.*

An exhaustive review of the ALJ's reasons for discrediting Schulte's testimony concerning the frequency and severity of his arthritic flares and their associated symptoms reveals that the ALJ's conclusions are adequately supported by the record. What little evidence is available reveals infrequent treatment during which his doctors observed few if any symptoms. His two post-application appointments (the only two appointments after October 21, 2004 for the two year period prior to expiration of Schulte's insured status) were not prompted by the disabling effects of Schulte's symptoms, but by the need to document Schulte's illness or in anticipation of the hearing before the ALJ. Tr. 174, 193. Although Schulte testified that Aleve provided him with no relief (Tr. 210), he previously reported to his doctor that it was "moderately helpful" in relieving his pain. Tr. 180. Since Dr. Ladd first discussed other medication options with him on October 21, 2004 (Tr. 176), Schulte has declined to take those medications, citing cost concerns (and at the hearing, toxicity concerns, Tr. 209), but without determining the actual out-of-pocket cost. Tr. 174, 193.

This court will assume without deciding that it was improper to discredit Schulte's testimony for failing to take the recommended medications based on his statement that he could not afford those medications. *See*, *e.g.*, *Regennitter v. Comm'r of Social Sec. Admin.*, 166 F3d 1294, 1296-97 (9th Cir 1999) (discussing inability to afford prescription medications). However, even leaving that reason aside, the ALJ provided other clear and convincing reasons to discredit Schulte's testimony. The record supports the ALJ's conclusions that Schulte did not miss a lot of work due to his impairment, contrary to Schulte's testimony, and that the medical evidence is not of the caliber that would be expected given the allegations of weekly debilitating flare ups.

Nothing in the record indicates any cost concerns associated with visits to Dr. Ladd, yet those visits were few and far between.

While Schulte implies that his lack of treatment was due to his lack of symptoms between flare ups and his inability to leave home (and presumably to attend a doctor's appointment) during flare ups involving his lower extremities, no medical record documents these lower extremity flare ups (other than as reported by Schulte). It is an equally plausible conclusion that his lack of treatment was due to flare ups that were less frequent than Schulte contends. Nothing in the record explains Schulte's failure to return to see Dr. Ladd during a flare up, despite Schulte's testimony that the flare ups start slowly, eventually building to an intense pain. Tr. 211. Schulte may also have felt that returning to Dr. Ladd was fruitless, given the lack of a cure or effective treatment. However, the record does not reflect that reason. In fact, the record does not even contain any corroborating testimony from third parties. In sum, Schulte's contention of weekly flare ups and incapacitating symptoms during those flare ups is undermined by the lack of treatment and the gaps in any medical treatment for long stretches of time.

Thus, the ALJ's reasons for discounting Schulte's testimony as to the frequency and severity of his symptoms are supported by substantial evidence in the record, and this court will not disturb the adverse credibility finding.

## II.  Opinion of Dr. Ladd

Schulte also challenges the ALJ's rejection of the February 12, 2007 letter opinion of Dr. Ladd, his treating rheumatologist. In that letter, prepared just prior to the hearing before the ALJ, Dr. Ladd opined that "given the present pattern of [Schulte's] illness, he is not capable of

Case 3:07-cv-06269-ST    Document 17    Filed 07/23/08    Page 17 of 18

sustaining a regular work schedule" and that Schulte's "attacks are severe enough to cause him to

miss work and [to] have difficulty doing even sedentary activity." Tr. 189.

The ALJ discounted Dr. Ladd's opinion, giving it only "limited weight," based on the

ALJ's conclusion that Schulte's claims regarding the extent and nature of his arthritic symptoms

was not credible:

> In view of the claimant's lack of credibility regarding his episodes
> of arthritis, Dr. Ladd's opinion of February 12, 2007, where he
> stated that based on the present pattern of his illness, he was not
> capable of sustaining even regular sedentary work, must be
> discounted. Dr. Ladd specified that he was relying on the
> claimant's statements of the frequency of flares, despite a record
> which shows that such reliance [is] misplaced. He further stated
> that he had actually seen swelling no more than twice. Therefore,
> even should Dr. Ladd be accurately described as a treating
> physician, the lack of substantiating diagnostic evidence and his
> acceptance of the claimant's grossly overstated description of his
> symptoms precludes this opinion from being entitled to more than
> limited weight.

Tr. 20.

As just discussed, this court concludes that the ALJ gave adequate reasons for rejecting

Schulte's testimony about the frequency and severity of his symptoms. Dr. Ladd's letter and

treatment notes reveal that his opinion is based largely on Schulte's reports of the frequency and

debilitating symptoms of his arthritic flares. However, an ALJ may reject a treating physician's

opinion if it is based "to a large extent" on a claimant's self-reports that have been properly

discounted as incredible. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 602 (9th Cir

1999), citing *Fair v. Bowen*, 885 F2d 597, 605 (9th Cir 1989). As discussed above, the ALJ

properly discounted Schulte's testimony concerning the frequency and severity of his arthritic

17 - OPINION AND ORDER

attacks.  Accordingly, the ALJ properly rejected Dr. Ladd's opinion because it relied heavily on those discounted assertions.

**III.  Other Work**

Finally, Schulte contends that the ALJ failed to prove that he could perform other work in the national economy.  However, that argument is premised upon the contention that the ALJ improperly rejected Schulte's testimony and Dr. Ladd's letter opinion.  As explained above, the ALJ gave adequate reasons for rejecting both Schulte's testimony and appropriately discounted Dr. Ladd's opinion as based primarily on that rejected testimony.  Taking that conclusion into account, the record reveals no basis on which to conclude that the ALJ erred in setting Schulte's RFC and relying on the VE's opinions regarding his ability to perform other work at step five.

## ORDER

Based on the reasons set forth above, the opinion of the Commissioner is AFFIRMED.

DATED this 23rd day of July, 2008.


/s/ Janice M. Stewart__
Janice M. Stewart
United States Magistrate Judge

18 - OPINION AND ORDER